Roosevelt SIMPSON, Plaintiff–
Appellant,

v.

DIVERSITECH GENERAL, INC.,
Defendant–Appellee.

No. 90–3371.

United States Court of Appeals,
Sixth Circuit.

Argued April 5, 1991.

Decided Sept. 26, 1991.

Thomas A. Sobecki (argued and briefed), Toledo, Ohio, for plaintiff-appellant.

William Gorenc, Jr. (argued and briefed), GenCorp, Fairlawn, Ohio, for defendant-appellee.

Before MERRITT, Chief Judge and KENNEDY and JONES, Circuit Judges.

NATHANIEL R. JONES, Circuit Judge.

In this employment discrimination action, plaintiff-appellant Roosevelt Simpson appeals the judgment for defendant-appellee Diversitech General, Inc. (Diversitech). For the following reasons, we reverse the judgment below and remand for proceedings consistent with this opinion.

I.

On January 17, 1989, Simpson filed this action against Diversitech alleging discriminatory discharge in violation of Title VII of the Civil Rights Act of 1964. A three day bench trial began on March 1, 1990, and resulted in a judgment in favor of Diversitech. The facts of this case are as follows.

Simpson began employment with Diversitech in July 1970. He worked as an embosser at Diversitech's Toledo facility. The facility produces vinyl-coated fabric and upholstery for automotive and furniture applications. During his employment with Diversitech, Simpson was disciplined three times for violations of company rules and regulations. The third incident resulted in his dismissal.

The first incident for which Simpson was disciplined occurred on October 1, 1986. At that time, he was responsible for running vinyl covering through the embossing process. Before embossing the vinyl, Simpson was required to take a sample of vinyl covering to the quality control laboratory for inspection. When he took the sample of vinyl covering to the laboratory, he also brought a "hardboard" which contained the specifications against which the sample would be checked. While waiting at the laboratory, Simpson engaged in a conversation with Allen Haley, a white male and the stepson of William Dudgeon, Diversitech's Director of Human Relations. Simpson apparently requested that Haley share with him the food he was eating and Haley refused. Simpson then made a derogatory remark about Haley's Catholicism after which Haley referred to him as a "nigger." Haley called Richard Ruckman and informed him that Simpson was being disruptive and would not leave the lab. Ruckman, a white male, was the third shift superintendent and thus the third ranking company official on the third shift.

Before Ruckman arrived, Simpson left the laboratory with the hardboard. Pat Poirier, also a white male and a good friend of Haley, followed Simpson in order to get the hardboard from him. An altercation occurred between Simpson and Poirier at the latter's work station over Simpson's refusal to relinquish the hardboard. Simpson "grabbed Poirier, squeezed him, and let him go." Poirier obtained a copy of a production ticket from a nearby desk and returned to the lab. The production ticket contained the same specifications on the hardboard. Later, upon being approached at his workstation and requested by Ruckman to hand over the hardboard, Simpson

denied that he had it. He had actually placed the hardboard in the trash can near his work station, allegedly so that Haley could not hide it and blame the loss on Simpson. Ruckman did not take any disciplinary action but merely noted the incident in his log.

After the shift ended, Poirer called David Baransky, Diversitech's Industrial Relations Coordinator, and reported the incident. Poirer demanded that some action be taken against Simpson. Normally, such an incident would be investigated by Dudgeon. But because he was Haley's stepfather, Dudgeon disqualified himself from the disciplinary inquiry. Baransky conducted an investigation and thereafter instructed Ruckman to issue an adverse personnel report on Simpson. Sometime before Ruckman issued the report, Baransky suspended Simpson for thirty days. The latter filed a grievance challenging his suspension and a hearing was held on October 2 and 3, 1986. Representing Simpson at this hearing was a union representative. Notes were taken by Diversitech and the union. The minutes do not reflect that racial slurs or racial discrimination were alleged at the disciplinary hearing. Following the disciplinary hearing, Baransky concluded that Simpson was guilty of insubordination and disruption and ordered that Simpson be suspended for seven days, rather than thirty, with any further incident resulting in termination. Haley was not disciplined for the incident. The district court found that "Ruckman played no role in the discipline that resulted from [this] incident."

The second disciplinary incident occurred on February 16, 1987. Ruckman observed Simpson taking a break in an area that was not Simpson's assigned break area. Ruckman told him to leave and return to his assigned area. Simpson refused and demanded that his union representative be called, contending that he had the company's permission, via an earlier incident, to have his break in the area in question. After sending Simpson home for the remainder of his shift, Ruckman filed an adverse personnel report. Upon reviewing the report, Baransky discharged Simpson.

This action led to the filing of a grievance which was denied by Diversitech. The company then offered to reinstate Simpson if he agreed to sign a Last Chance Agreement. In exchange for reinstatement, Simpson agreed in the Last Chance Agreement not to be involved in any similar incident in the future. The agreement provided that any similar conduct by the appellant would result in termination.

The third and final disciplinary incident involving Simpson occurred on June 18, 1987. He was observed by Jerry Swartz, the tolex supervisor, in the tolex department. Simpson testified that he was there in an attempt to make sure that a new employee knew her way around the plant. Swartz directed him to return to his work station. Rather than complying with Swartz's instructions, the record shows that Simpson began arguing with him. Furthermore, Swartz testified that Simpson poked him in the nose while gesturing. Simpson denies it, but countered that Swartz called him a "nigger," which Swartz denies. The district court, however, found Swartz' testimony more credible. Ruckman and a union steward, David Massie, were called and when Swartz began to explain the incident to them Simpson began to walk away, refusing to remain though requested to do so by Ruckman. Simpson was suspended subject to discharge and later permanently discharged.[1] A grievance was filed which was denied and later upheld by an arbitrator.

Ruckman often referred to Simpson as a "nigger" and a "lazy nigger." Moreover, the testimony of plaintiff's witnesses also testified that Ruckman often followed black employees around looking for an opportunity to cite them for company violations.

Although the court concluded that Ruckman played no role in the first incident, the court found that he had initiated the disciplinary proceedings leading to the Last Chance Agreement, which led to the discharge in June 1987. Thus, the trial court found that this was a mixed-motives case but concluded that Diversitech had carried its burden of showing that Simpson would have been discharged even absent the racial animus. This appeal followed.

## II.

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the Supreme Court set forth the basic allocation of burdens of proof in a Title VII case alleging discriminatory treatment.

To establish a prima facie case of discriminatory discharge, a plaintiff must prove by a preponderance of the evidence: (1) [he] belongs to a protected class or minority; (2) [he] was qualified for [his] job; (3) [he] was terminated despite [his] qualifications; and (4) after [he] was fired, [his] job remained open and the employer sought applicants whose qualifications were no better than [his] qualifications.

*Trujillo v. Grand Junction Regional Center*, 928 F.2d 973, 977 (10th Cir.1991) (citations omitted); *see also Potter v. Goodwill Indus.*, 518 F.2d 864, 865 (6th Cir.1975) (per curiam) (in a Title VII discriminatory discharge case, plaintiff must show that he was a member of protected class; he was discharged without valid cause; and employer solicited applicants for the position). If plaintiff establishes a prima facie case of discrimination, the burden then shifts to the employer to articulate a legitimate nondiscriminatory reason for its action. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093. Should the employer meet this burden, plaintiff must then prove that the employ-

---

**1.** Simpson contended below that Ruckman advised Swartz to take disciplinary action if appellant was ever in Swartz's department. The district court found that no such instruction was given by Ruckman. However, the court stated that even if such instruction had been given it would not have been inappropriate in view of appellant's status under the Last Chance Agreement. Further, a black employee, Sabrina Morris, testified that she was disciplined by Swartz for not doing work and for insubordination, but that two white workers who committed the same offense were not disciplined.

er's proffered reason for termination was merely pretextual. *Id.* In addition, the Supreme Court held in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), that when a plaintiff in a Title VII case proves that race or gender played a motivating part in an employment decision the defendant "may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the plaintiff's gender [or race] into account." *Id.* 109 S.Ct. at 1795. With these legal principles in mind, we address the issues before us.

### III.

The first issue [2] is whether the trial court erred in finding that racial animus did not exist in the October 1986 incident. Simpson contends that racial animus is clearly shown in the 1986 incident by the different treatment received by Haley, a similarly situated white employee.

■ Due to the October 1, 1986, incident, Simpson was suspended and subjected to disciplinary proceedings. Haley, on the other hand, was neither suspended nor subjected to disciplinary proceedings. This discrepancy, however, does not alter the trial court's finding that no racial animus lurked behind the October 1986 incident.

Simpson and Haley exchanged derogatory remarks about one another during the October 1986 incident but neither was punished for those remarks. Simpson's resultant suspension from the incident was not due to his name-calling or use of abusive language towards Haley; rather, his suspension was due to his altercation with Poirier and to his insubordination to Ruckman.

The trial court's finding that racial animus played no role in the October 1986 incident is also supported by the finding that Ruckman played no role in the October 1986 incident. Ruckman merely noted the incident of insubordination and misconduct on his log. Ruckman did not pursue an

adverse personnel report until instructed to do so by his superiors. Further, the incident was brought to the notice of Ruckman's superiors by Poirier, not by Ruckman.

Taken together, the foregoing reveals that the district court's finding that the October 1986 incident was not grounded in racial animus is supported by the record.

### IV.

■ We must turn now to the more problematic portion of this employment discrimination case and address the question of whether the trial court erred in finding that Diversitech had met its burden of proving that Simpson would have been discharged had race not been a motive. Simpson contends that absent the discriminatory motivation he would not have been discharged.

The district court below found that

it is more likely than not that plaintiff's race played a role in Ruckman's response to the second incident, which in turn resulted in the Last Chance Agreement, which was the basis for Plaintiff's discharge.

Hence, the court determined this case to be a mixed-motives case subject to the holding of *Price Waterhouse.* The court went on to conclude that Diversitech had met its burden of showing that it would have made the same decision absent the unlawful motive.

The court's conclusion that Diversitech had met its burden under *Price Waterhouse* was based on the following: (1) "Ruckman played no role in the final decisions that were implemented following each of the incidents;" (2) "the independent assessment and judgment of the other participants (i.e., Baransky and Dudgeon) functioned to attenuate the taint of any animus that may have motivated Ruckman;" (3) "Baransky made the final decision with regard to the first incident, and Dudgeon made the final decision with re-

2. Simpson raised an evidentiary issue with respect to the district court's failure to admit the union's minutes, taken during the October 2 and

3, 1986 disciplinary hearing. Because we reverse this case on other grounds, the evidentiary issue is moot.

gard to the second and third incidents." Most important to the lower court with respect to the *Price Waterhouse* burden was "the fact that Ruckman did not make the decision to terminate the plaintiff."

The district court's finding that Ruckman played no role in the final decision with regard to Simpson's dismissal does not end the inquiry. To be sure, Ruckman's superiors, Baransky and Dudgeon, made the crucial decisions after each of the three incidents, including the decision to terminate Simpson. The focus in this particular case, however, must be upon Ruckman's race-based actions. *See Price Waterhouse*, 109 S.Ct. at 1791–92 ("[A]n employer may not meet its burden in [a mixed-motives case] by merely showing that at the time of the decision it was motivated only in part by a legitimate reason. The very premise of a mixed-motives case is that a legitimate reason was present[.]"). If Ruckman initiated the disciplinary action leading to Simpson's dismissal due to Simpson's race, simply showing that Ruckman had no role in the "final" decision to terminate him is insufficient to establish that Diversitech would have made the same decision even absent the racial animus. As the evidence revealed that Ruckman disciplined Simpson in February 1987 because of his race and that the February 1987 incident led substantially to Simpson's dismissal, the fact that Ruckman did not "pull the trigger" is of little consequence. *See Terbovitz v. Fiscal Curt of Adair County, Ky.*, 825 F.2d 111, 115 (6th Cir.1987) (crucial question in mixed-motives case is one of causation).[3]

The district court found that (1) it is more likely than not that Simpson's race played a role in Ruckman's response to the second incident; (2) the second incident resulted in the Last Chance Agreement; and (3) the Last Chance Agreement was the basis of Simpson's discharge. The lower court's own factual findings indicate that Ruckman's race-based actions led to Simpson's discharge, having formed the predicate for the Last Chance Agreement. *See Terbovitz, supra.* The fact that he

"played no role whatsoever in the formulation or entry of the Last Chance Agreement" is of little import. This is so because absent Ruckman's race-based motive, as found by the district court, there would not have been a Last Chance Agreement. Nothing occurred after the second incident to expunge those actions. Thus, we conclude that there were impermissible racial motivations for the termination of appellant and its genesis was, as found by the district court, in the response of Ruckman.

This is not an easy case. The record clearly reveals that Simpson was an obstinate and, at times, a rather "mobile" employee. This fact, however, does not render race-based motives against such an employee justified. After careful review, we conclude that Diversitech did not carry its burden under *Price Waterhouse* to show that it would have made the same decision absent the unlawful motive.

## V.

For the foregoing reasons, we REVERSE the district court and REMAND for proceedings consistent with this opinion.

KENNEDY, Circuit Judge, dissenting.

Because the majority expands the scope of so-called "mixed-motive" discrimination under Title VII past its limits, I respectfully dissent.

Title VII forbids an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's race." 42 U.S.C. § 2000e–2(a)(1) (emphasis added). The source of my disagreement with the majority concerns whether, accepting the magistrate judge's factual findings, Simpson has shown that he was discharged "because of" his race under Title VII.

---

**3.** Although decided prior to the Supreme Court's decision in *Price Waterhouse, Terbovitz* is consistent with *Price Waterhouse.*

This case involves three separate incidents for which Roosevelt Simpson was disciplined by his employer for violations of company rules, culminating in his discharge. The trial judge found as a fact that there was no racial animus or evidence of any racial bias on the part of the *actual decision makers* who disciplined plaintiff on the three occasions, including his discharge. The magistrate judge therefore found that defendant had carried its burden of proving that the ultimate decision to discipline plaintiff on each of the three occasions would have been made in the absence of any racial animus. This is a factual finding which is not clearly erroneous.

The only evidence of racial animus which the lower court substantially credited was the testimony of Mark Eckhart, that Richard Ruckman used a racial epithet when referring to plaintiff. The remarks were made in the office where Ruckman was doing his paper work and accompanied by Ruckman's complaints that the plaintiff was lazy and not doing his job. Simpson was not present.

The sole finding of the lower court with respect to racial animus is "I find that Ruckman had on occasion used that term [a racial epithet], and that such use manifests some perceptible degree of racial animus." Magistrate Judge's Opinion at 13.[1] It found that this racial animus "played a role in Ruckman's response to the second incident" which, taken together with the first incident, led to the Last Chance Agreement, the violation of which led to Simpson's discharge. *Id.* at 13–14.[2]

The majority finds that "Ruckman disciplined Simpson in February 1987 because of his race." Majority at 160. The lower court did not make that finding. Rather, it found only that racial animus played *"a role"* in Ruckman's response to the incident. The evidence showed that whites were also disciplined for insubordination or for being away from their departments. The magistrate judge made the findings that plaintiff was insubordinate without cause on this second occasion and that plaintiff's contention that he had been permitted to take a break in that area was not supported by credible evidence. The discharge after the second incident was grieved. Plaintiff agreed to the Last Chance Agreement at a grievance hearing. The lower court rejected plaintiff's testimony that he entered into that agreement involuntarily.

The majority does not question the magistrate judge's finding that Simpson was insubordinate or that the conduct was grounds for discharge or that the decision to discharge was made not by Ruckman, but was made by his superiors who were not motivated by racial animus. Rather, the Court is adopting some sort of a "but for" causation test in order to classify this as a mixed-motive discrimination case. Apparently, the majority's syllogism is as follows: (1) "but for" Ruckman's racial animus, Simpson's violation of company rules at the time of the second incident would have been overlooked by Ruckman and would not have come to the attention of the actual decision makers; (2) the second incident was a factor in the ultimate decision to discharge Simpson (as one of the three

1. The court did not find, as the majority asserts, that Ruckman "often" racially slurred Simpson. Majority at 158. The majority also credits the testimony of several witnesses respecting Ruckman's racial animosity. *Id.* However, the magistrate judge in his opinion painstakingly summarized the testimony of each of those witnesses and found it to be substantially unbelievable, crediting the testimony only to the extent that it corroborated Eckhart that Ruckman had "on occasion" used the racial epithet "nigger."

The racial discrimination about which other of plaintiff's witnesses testified and which was found not credible by the magistrate judge was that Ruckman disciplined black employees but not white employees. However, the discipline records showed that both black and white employees were in fact disciplined for unauthorized absence from their departments or for insubordination. Of the 39 disciplinary actions, discipline was given to 15 Whites, 6 Blacks and 3 Hispanics. Only one other employee was discharged for these offenses and he was white. Simpson did not produce evidence that any specific white employee was not disciplined for conduct similar to his own.

2. I note that the lower court never found nor implied that Ruckman had engaged in any efforts to discharge Simpson.

separate infractions that together led to the decision to discharge); and, therefore (3) Simpson was discharged "because of" his race.

Suppose the misconduct had been a theft which was reported by a fellow employee in part due to racial animus. A neutral decision maker then decided to discharge based on the theft. Under the majority's reasoning, that discharge would be "because of" race. Here the causation is far more attenuated, as it was the combined effect of three separate infractions that led to Simpson's dismissal. The lower court found that racial animus played no part in the first and third incidents that led to Simpson's dismissal. Nor is there any question but that Simpson was guilty of the second infraction and the final decision maker in that episode harbored no racial animus.

Under the test of causation adopted by the majority today, if any part of an employee's disciplinary record can be shown to have been influenced by racial animus—apparently even where the employee was guilty of misconduct on such occasion—any subsequent action taken by an unbiased decision maker who is considering the entire record is a decision "because of" race under Title VII. Surely that is not the law. The "but for" test is not the test of legal causation ordinarily used in tort law be-

cause it is over-inclusive. It is over-inclusive here.[3]

The majority fails to recognize that the focus of the causation question itself must be on the *decision maker* making the *challenged* employment decision. The majority focuses on the supervisor's response to the second incident. However, the challenged employment decision is Simpson's final discharge.[4] Once the question is properly framed, the flaw in the majority's causation analysis becomes clear.

In discussing when a case becomes a mixed-motive case under Title VII, the Supreme Court has held that "[t]he critical inquiry, the one commanded by the words of § 703(a)(1) [of Title VII], is whether [the illegitimate consideration] was a factor in *the* employment decision *at the moment it was made." Price Waterhouse v. Hopkins,* 490 U.S. 228, 241, 109 S.Ct. 1775, 1785, 104 L.Ed.2d 268 (1989) (Brennan, J. plurality opinion) (emphasis in original). *See also id.* at 241, 109 S.Ct. at 1785 ("When, therefore, an employer considers both gender and legitimate factors *at the time of making a decision,* that decision was 'because of' sex....") (emphasis added); *id.* at 250, 109 S.Ct. at 1790 ("In saying that gender played a motivating part in an employment decision, we mean that, if we asked the employer *at the moment of the decision* what its reasons were and if we received a truthful response, one

**3.** The prevailing pattern of American legal thought is that "but for" cause is a necessary but not sufficient ground for establishing legal causation. *See, e.g.,* Restatement (Second) of Torts §§ 430–433, and comments (1965); 4 Harper, James and Gray, The Law of Torts ch. 20 (2d ed. 1986); H. Hart and A. Honore, Causation in the Law chs. IV, V (2d ed. 1985); Prosser and Keeton on the Law of Torts §§ 41–44 (5th ed. 1984). I see no reason why causation in Title VII cases should be treated differently, nor has the majority articulated any reason for its departure from the causation principles historically applied in such cases.

It is true that the Supreme Court in *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 282 n. 10, 96 S.Ct. 2574, 2580 n. 10, 49 L.Ed.2d 493 (1976), stated that when a Title VII plaintiff seeks to show that an employer's explanation for a *challenged* employment decision is pretextual, "no more is required to be shown than that race was a 'but for' cause." However, as the *Price Waterhouse* Court pointed out, *Mc-*

*Donald* dealt with the question whether the employer's stated reason for the challenged employment decision was a *pretext.* 490 U.S. at 240 n. 6, 109 S.Ct. at 1785 n. 6. Here, on the other hand, there is no claim that Diversitech used Simpson's three rules violations as a pretext for race discrimination. The only question is whether Ruckman's response to the second incident can fairly be said to be the "cause" of Simpson's discharge.

**4.** Even if Simpson is viewed as challenging the discipline he received following the second incident itself, the result is the same because it has been found that "Ruckman played *no role* in the final decisions that were implemented following *each* of the incidents." Magistrate Judge's Opinion at 14 (emphasis added). William Dudgeon, the Director of Human Relations for Diversitech, made the final disciplinary decision following the second incident. *Id.* The majority does not hold these findings clearly erroneous.

of those reasons would be that the applicant or employee was a woman.") (emphasis added); *id.* at 246 n. 11, 109 S.Ct. at 1788 n. 11 (the focus is on whether "gender was a factor in a *particular* decision *when it was made*") (emphasis added).

Here it has been found that racial animus played no part in any of the following decisions: (1) the decision to file a report regarding the first incident; (2) the decision to discharge Simpson after the second incident; (3) the decision to allow Simpson to return to work if he signed a Last Chance Agreement; (4) the decision to report the third incident; and (5) the decision to discharge Simpson after he violated the Last Chance Agreement. It is the final decision listed here, to discharge Simpson, which is being challenged. Under the Supreme Court's analysis the critical question is as follows: Was race a factor in the decision to discharge Simpson following the third incident, at the moment the decision to discharge was made? The magistrate judge answered this question "no." Therefore, I would hold that this is not a mixed-motive case as no prima facie case has been shown to establish that Simpson was discharged "because of" his race.

Finally, the magistrate judge concluded that defendant met its burden of proof that the "same ultimate decision would have been made in the absence of the racial animus that appears to have motivated Ruckman's suspension of the plaintiff prior to the Last Chance Agreement." Magistrate Judge's Opinion at 14. That factual conclusion was not clearly erroneous and should be upheld.

The judgment in favor of Diversitech should be AFFIRMED.