**Alphonse F. YACOUB, Plaintiff,**

v.

**James P. McGOVERN, Acting Secretary, Department of the Air Force, Defendant.**

**No. 89–CV–1004.**

United States District Court, N.D. New York.

Dec. 16, 1993.

---

Carter, Conboy, Bardwell, Case, Blackmore & Napierski, Albany, NY (John W. Vandenburgh, of counsel), for plaintiff.

Air Force Legal Services Agency, Arlington, VA (Lesa L. Carter, of counsel) and U.S. Dept. of Justice, N.D.N.Y., Syracuse, NY (Barbara E. Yunis and William Pease, of counsel), for defendant.

*MEMORANDUM–DECISION and ORDER*

HURD, United States Magistrate Judge.

## I. INTRODUCTION.

The plaintiff, Alphonse F. Yacoub, was employed as a civilian "auditor-trainee, GS–7" with the Department of the Air Force between March 1984, and April 1985. He was assigned to Griffiss Air Force Base ("GAFB"), Rome, New York. He filed suit pursuant to 42 U.S.C. § 2000e *et seq.* (Title VII of the Civil Rights Act of 1964), and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* Specifically, plaintiff claims that the defendant United States Department of the Air Force discriminated against him based upon his national origin and/or age when his employment was terminated. Plaintiff seeks back pay, reinstatement, attorney's fees, and expenses. In its answer, defendant denied the material allegations in the complaint and raised certain affirmative defenses.

## II. TRIAL.

The court conducted a three day non-jury trial on June 7, 8, and 9, 1993, in Rome, New York.[1] The following Memorandum–Decision and Order constitutes the court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## III. FINDINGS OF FACT.

The parties' stipulated facts (Court Exhibit No. "1") are incorporated herein and made a part hereof.

The plaintiff was born on March 9, 1928. He is of Egyptian national origin having been born in Cairo, Egypt. He started work as an auditor-trainee with the Area Audit Office of the Air Force Audit Agency (AFAA) at GAFB on April 16, 1984, at the age of fifty-six. He was terminated from that position by letter dated March 12, 1985 (Pltf's Ex. 24), effective March 29, 1985, (later extended to April 12, 1985 (Pltf's Ex. 25)) when he was fifty-seven years old. During that period of time, Armand Routhier ("Routhier") was the supervisor and/or chief of the GAFB area audit office, and the plaintiff's immediate supervisor. Vaughn Schlunz ("Schlunz") was the supervisor/auditor of the Air Force Audit Agency, and was Routhier's immediate supervisor. Edward Crick ("Crick") was the chief supervisor/auditor of the Northern Audit Region of the Air Force Audit Agency and was Schlunz's immediate supervisor. Neither Crick nor Schlunz were stationed at GAFB. Also working at the GAFB office were Thaddeus Ziemba ("Ziemba") and Joseph Sciulli ("Sciulli") as "senior auditors" whose duties included, among other things,

---

1. The court acknowledges with thanks, New York State Supreme Court Justice John W. Grow for graciously allowing the use of his courtroom during renovations of the Federal courtroom in Utica, New York.

supervising the work of auditor-trainees such as the plaintiff, training auditor-trainees, and reviewing the work product of auditor-trainees. The plaintiff was one of three auditor-trainees in the office at that time; the other two were Leslie Sax and Carol Rypkema.

From 1972 to 1985, Routhier supervised approximately thirty to forty auditor-trainees at GAFB. Plaintiff was the oldest auditor-trainee; most of the other auditor-trainees were just recently out of college and in their twenties. He was also the only auditor-trainee with a national origin from the Middle East. Most, if not all, of the other auditor-trainees were of European–American national origin.

The plaintiff worked on five audits between the start of his employment and March 1985. Two audits were under the supervision of Ziemba, two were under the supervision of Sciulli, and the final one was under Routhier's supervision. Each project was to be followed by an individual audit evaluation (AFAA Form 43A). The first audit for Ziemba entitled "Host Tenant Support Agreement—Griffiss AFB" was followed by Ziemba's audit evaluation on August 3, 1984 (Pltf's Ex. 15), and was satisfactory to the plaintiff. For some reason, Ziemba did not complete an individual audit evaluation, AFAA Form 43A, as required by the New Personnel Training Program (Pltf's Ex. 9), for the second audit entitled "Host Tenant Support Agreement—Niagara Falls". Two audit evaluations signed by Sciulli were dated November 28, 1984 (Pltf's Ex. 16), and January 9, 1985 (Pltf's Ex. 17),[2] and involved "Management of Paying and Collecting Area" and "Management of Heating, Ventilation and Air Conditioning Contracts." Both evaluations gave plaintiff an outstanding rating.[3] For some reason Routhier never completed an AFAA Form 43A evaluation on the plaintiff's final audit entitled "Hospital Supply Receiving." In addition, during 1984, plaintiff received a job performance appraisal signed by Routhier on April 18, 1984 (Pltf's Ex. 11); a civilian performance and pro-

motion appraisal signed by Routhier on July 11, 1984 (Pltf's Ex. 10); a quarterly training progress report (AFAA Form 43) signed by Routhier on July 13, 1984 (Pltf's Ex. 12); and a second quarterly training progress report (AFAA Form 43) signed by Routhier on October 12, 1984 (Pltf's Ex. 13). All of the evaluations throughout 1984 placed the plaintiff at or above the trainee level of performance.

However, during this period of time, the plaintiff contends that he was subject to acts and statements on the part of Routhier which exhibited a discriminatory animus directed toward him because of his national origin and age. Specifically, he claims that when he first met Routhier, he was told that because of his name, Routhier thought he was a woman. The plaintiff further contends that during lunch about a week after the start of his employment, Routhier asked him whether or not he was a member of the Palestine Liberation Organization ("PLO"); if Egyptians still eat raw meat; whether Egypt would still be faithful to the United States; and whether the Egyptians still use camels as a means of transportation. Routhier also indicated his doubts about Egyptian loyalty, stated that the Middle East was an area of trouble, and wondered why President Reagan still gave them financial aid. This was followed by various acts on the part of Routhier which the plaintiff interpreted to be hostile toward him because of his national origin, which included Routhier's refusal to invite him to a racquetball game; refusal to socialize with him on a daily basis at the office; refusal to eat a dip prepared by the plaintiff for a Christmas social function; and refusal to let him leave early prior to the Memorial Day weekend when the other employees were allowed to leave. Routhier also complained a number of times about plaintiff's accent. In addition, the plaintiff contends that Routhier exhibited a hostile nature toward him with regard to his age because he said he looked pale; was "going downhill"; that he should have a medical

---

**2.** There are serious questions as to whether or not these evaluations were actually signed on those dates. Sciulli's credibility on that issue was clearly placed in doubt.

**3.** These evaluations vastly overrate the plaintiff. Nevertheless, both audits demonstrate that plaintiff was, at the very least, continuing to perform satisfactorily.

check-up because of his age; and made other general references to his mental and physical health. Finally, plaintiff contends that Routhier denied him proper training and deliberately made him look bad on some later audits. Routhier denies all of the plaintiff's allegations except that he did make a statement at one time that the plaintiff was ill and should take some time off. For the reasons set forth herein, the court accepts plaintiff's version of these events.

Until September or October 1984, the plaintiff had little direct contact with Routhier since his principal hands-on one-to-one training and supervision was by either Ziemba or Sciulli. It was about this time that Routhier first began to formulate in his mind that the plaintiff might have to be terminated prior to the end of the one year probationary period. At this point, there was nothing in the evaluations or files to indicate that the plaintiff was anything other than progressing in a satisfactory manner. Under the regulations, a decision should be made within one year from the date of employment whether or not a trainee auditor's performance was unacceptable so as to make it a waste of time and effort for him or her to continue with the program, even though on average, an auditor-trainee would take two years in which to become a fully qualified auditor. (Pltf's Ex. 9) After Routhier decided that he would have to terminate the plaintiff, he conferred with Crick in November 1984, on one of his routine visits to GAFB, and advised him as to what he viewed the problems were concerning the plaintiff's work and progression as an auditor-trainee. Crick spoke very briefly with the plaintiff about his work in general rather than in specific terms. Up to then, the plaintiff had received the usual training procedures for an auditor-trainee, but little one-on-one assistance from Routhier. This is in contrast to the assistance Routhier gave to the other two auditor-train-ees, whom he apparently liked much better than the plaintiff.[4]

It wasn't until Routhier completed a quarterly training progress report (AFAA form 43) signed on January 22, 1985 (Pltf's Ex. 14), covering the period from October 1, 1984 through December 31, 1984, that there is any real written documentation critical of plaintiff's progress. In that report, Routhier noted that the plaintiff was making limited progress and required further training. No further training was provided to the plaintiff subsequent to that report. Finally, the remarks concluded: "If his [plaintiff's] performance does not improve, we may seek removal during probationary period." Almost immediately thereafter, in late January or early February 1985, Routhier prepared a draft of a termination letter directed to the plaintiff.

In February 1985, Crick sent Schlunz to GAFB in order to investigate and report as to whether the plaintiff should be terminated.

Prior to Schlunz's arrival at GAFB, in addition to preparing the draft termination letter, Routhier also made his own audit re-evaluations (AFAA Form 43A) for the two "Host Tenant Support Agreement" audits which were originally supervised and evaluated by Ziemba. These re-evaluations by Routhier were completed on February 14, 1985 (Pltf's Ex. 19), and February 19, 1985 (Pltf's Ex. 20).[5] Routhier also made an audit re-evaluation (AFAA Form 43A) for the "Management of Heating, Ventilating and Air-Conditioning Contracts" which he signed on February 21, 1985. (Pltf's Ex. 18) This was the same audit previously evaluated by Sciulli dated January 9, 1985. (Pltf's Ex. 17) Finally, he made a re-evaluation and audit evaluation (AFAA Form 43A) for "Management in Paying and Collecting Areas" audit which was signed by him on February 22, 1985. (Pltf's Ex. 21) This had been the same audit which was previously evaluated

---

4. The other civilian auditor-trainee was actively recruited for the position by Routhier.

5. Although the individual audit evaluation completed by Routhier on February 19, 1985, was the first such evaluation for the "Host Tenant Support Agreement—Niagara Falls", there was no testimony or documentary evidence introduced to suggest that Routhier completed this evaluation because Ziemba had failed to do so as required by the regulations. In fact, as will be discussed infra, the court is of the opinion that Routhier went back and re-evaluated all of plaintiff's work in an effort to make a "paper record" to justify his preordained conclusion to terminate plaintiff.

by Sciulli dated November 28, 1984. (Pltf's Ex. 16) All of these five audit re-evaluations were performed over a one week period by Routhier, immediately prior to the arrival of Sciulli. Contrary to Ziemba's and Sciulli's previous audit evaluations, he pointed out the unsatisfactory performance and various shortcomings of the plaintiff. Routhier's re-evaluations of previous audits were so unusual that no evidence was introduced of it ever happening before or since.

Schlunz made his visit to GAFB on February 27, and 28, 1985. Upon his arrival, Schlunz reviewed these re-evaluations and the quarterly reports by Routhier, and concurred in the determination that plaintiff should be terminated. He also discussed the matter briefly with the plaintiff. As noted above, by the time he arrived at the base, the draft of the termination letter had already been prepared by Routhier. At that time, Schlunz did not review the satisfactory audit evaluations that were prepared by Ziemba and Sciulli. At the completion of the visit, he made six pages of hand written notes of his conclusions dated February 28, 1985. (Pltf's Exs. 22 & 23) It is not clear when these notes were received and reviewed by Crick. In any event, based chiefly upon Schlunz's report, Crick concurred in the termination.

Less than two weeks after Schlunz left GAFB, on March 12, 1985, Routhier personally delivered the termination letter to plaintiff. (Pltf's Ex. 24) The original termination was effective March 29, 1985, but was subsequently amended so that the plaintiff was eligible to continue to work until April 12, 1985. (Pltf's Ex. 25)

## IV. *CONCLUSIONS OF LAW.*

The court will first examine plaintiff's claim that he was intentionally discriminated against based on his national origin.

### A. *Title VII Claim.*

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–16, states, in pertinent part: "All personnel actions affecting employees ... in military departments as defined in section 102 of Title 5 ... shall be made free from any discrimination based on race, color, religion, sex, or national origin."

The purpose of Title VII is to "eliminate certain basis for distinguishment among employees while otherwise preserving employer's freedom of choice." *Price Waterhouse v. Hopkins,* 490 U.S. 228, 239, 109 S.Ct. 1775, 1785, 104 L.Ed.2d 268 (1989). Recognizing the difficulty of proving discrimination, a claim based on the employer's state of mind, while simultaneously preserving an employer's prerogatives, the Supreme Court has developed two analytical frameworks which allocate the burden of proof so as to balance these interests.

In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and later in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the Supreme Court developed the framework for proving intentional discrimination in the absence of direct evidence. In order for a Title VII plaintiff to establish a claim through indirect evidence, a prima facie case of discrimination must be proved by a fair preponderance of the evidence. *Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093; *see also Price Waterhouse,* 490 U.S. at 271, 109 S.Ct. at 1802 (O'Connor, J., concurring) ("The entire purpose of the *McDonnell Douglas* prima facie case is to compensate for the fact that direct evidence of intentional discrimination is hard to come by.") The plaintiff must prove that: (1) he belongs to a protected class; (2) he was qualified to continue employment; (3) he was discharged; and (4) the discharge occurred under circumstances giving rise to an inference of national origin discrimination. *Montana v. First Federal Sav. & Loan Assoc.,* 869 F.2d 100, 104 (2d Cir.1989); *Song v. Ives Laboratories, Inc.,* 957 F.2d 1041, 1045 (2d Cir.1992). Establishment of a prima facie case, however, merely raises an inference of discrimination, and "in effect creates a presumption that the employer unlawfully discriminated against the employee." *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094. Once the plaintiff has proven a prima facie case of discrimination, the burden of production then shifts to the defendant "to rebut the presumption of discrimination by producing evidence that the

plaintiff was [terminated] for a legitimate, nondiscriminatory reason." *Id.* Once the defendant offers this type of evidence, the *McDonnell/Burdine* presumption drops from the case. *United States Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983). The plaintiff must then persuade the Court that the defendant's proffered reason was merely a pretext [6] and that he was the victim of intentional discrimination. *Saint Mary's Honor Ctr. v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2747–48, 125 L.Ed.2d 407 (1993) (The plaintiff retains the ultimate burden of persuading the trier of fact that he has been the victim of intentional discrimination.) Therefore, under the *McDonnell/Burdine* framework, the court must not only decide whether the proffered reason for the adverse employment decision is a pretext for discrimination, *Price Waterhouse,* 490 U.S. at 247, 109 S.Ct. at 1788–89, but must be convinced that there exists no other reasons suggested in the record that may justify the defendant's actions and that the plaintiff was the victim of intentional discrimination. *Saint Mary's,* —— U.S. at ——, 113 S.Ct. at 2755–56.[7]

■■■ Since the premise of the *McDonnell/Burdine* pretext analysis is "that *either* a legitimate *or* illegitimate set of considerations led to the challenged decision," *Price Waterhouse,* 490 U.S. at 247, 109 S.Ct. at 1789, that framework is inappropriate in cases where there is direct evidence that a

discriminatory criterion played a part in the employment decision. *Id.* at 246–47, 109 S.Ct. at 1788–89; *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 621–22, 83 L.Ed.2d 523 (1985); *Grant v. Hazelett Strip–Casting Corp.,* 880 F.2d 1564, 1568 (2d Cir.1989). In such a "mixed motives" case, the inquiry is whether the discriminatory criterion was a substantial or motivating factor in the decision making process, such that if it had been absent, a different decision would have been made. *Price Waterhouse,* 490 U.S. at 250, 109 S.Ct. at 1790–91; *Grant,* 880 F.2d at 1568; *Berl v. County of Westchester,* 849 F.2d 712, 714–15 (2d Cir.1988); *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 285–86, 97 S.Ct. 568, 575, 50 L.Ed.2d 471 (1977) (dual motivation/same decision test). In order to avoid liability then, the burden of proof shifts to the employer to prove by a preponderance of the evidence that plaintiff would have been discharged even if it had not considered the discriminatory criterion. *Price Waterhouse,* 490 U.S. at 242, 109 S.Ct. at 1786; *Grant,* 880 F.2d at 1568.[8] By thus analyzing the employer's motives, both the employee's Title VII rights and the employer's prerogatives are protected. Admittedly, this analytical framework places a heavier burden on the defendant than *Burdine;* but it is reserved, rightfully so, for those cases in which there is direct evidence of discrimination in the employment decision.

---

**6.** Plaintiff must demonstrate that the reason is pretextual "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095.

**7.** Before *Saint Mary's,* a plaintiff could succeed in proving intentional discrimination solely by disproving the truth of defendant's proffered reasons. *Aikens,* 460 U.S. at 716, 103 S.Ct. at 1482; *Lopez v. Metropolitan Life Ins. Co.* 930 F.2d 157, 161 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 228, 116 L.Ed.2d 185 (1991). However, *Saint Mary's* has worked a significant change in the law.

The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the

prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons, will *permit* the trier of fact to infer the ultimate fact of intentional discrimination.

*Saint Mary's,* —— U.S. at ——, 113 S.Ct. at 2749. As a result, rejection of the defendant's proffered reasons does not *compel* a finding of intentional discrimination, and although the plaintiff need not bring forth any additional proof of discrimination to succeed, the court must still be convinced that the plaintiff was the victim of intentional discrimination. *Id.*

**8.** In other words, "once the employee proves that the illegitimate reason played a part in the employer's motivation, the employer loses unless the employer can persuade the fact-finder that the adverse action would have been taken even in the absence of the illegitimate reason." *Davis v. State University of New York,* 802 F.2d 638, 644 (2d Cir.1986) (Newman, C.J., concurring).

954

Accordingly, in a Title VII discriminatory treatment case, the fact-finder must first determine whether to apply a "pretext" or a "mixed motive" analysis. *Price Waterhouse*, 490 U.S. at 247 n. 12, 109 S.Ct. at 1789 n. 12; *Barbano v. Madison County*, 922 F.2d 139, 142 (2d Cir.1990). If the plaintiff has demonstrated through direct evidence that a discriminatory criterion played a substantial or motivating part in the challenged employment decision, then the mixed motive analysis of *Price Waterhouse* applies. Consequently, the burden shifts to the employer to prove by a preponderance of the evidence that "its legitimate reason, standing alone, would have induced it to make the same decision" at the time the decision was made. *Price Waterhouse*, 490 U.S. at 252, 109 S.Ct. at 1792; *Barbano*, 922 F.2d at 145. In cases where there is direct evidence of discrimination, then, the fact-finder need not ever reach the question of "pretext". *Grant*, 880 F.2d at 1568. Alternatively, if the plaintiff cannot offer direct evidence of discrimination, the court must give him the opportunity to prove intentional discrimination through indirect evidence under the *McDonnell/Burdine* "pretext" analysis. *Price Waterhouse*, 490 U.S. at 247 n. 12, at 278, 109 S.Ct. at 1789 n. 12, at 1805 (O'Connor, J., concurring). In other words, if the plaintiff meets the initial burden of the mixed motive analysis by presenting direct evidence of discrimination, then the fact-finder need not engage in a "pretext" analysis. Therefore, the "key inquiry" at this point is whether there is direct evidence that "impermissible criterion played some part in the decision-making process." *Barbano*, 922 F.2d at 145.

### 1. *Direct Evidence of National Origin Discrimination:*

█ The plaintiff contends that Routhier's statements, acts, and attitude toward him is direct evidence that he was terminated because he was Egyptian. Routhier denies that he acted with discriminatory animus when he discharged plaintiff; denies all of the conversations or statements attributed to him by the plaintiff regarding the plaintiff's Egyptian national origin; and further denies that he had any attitude or dislike toward the plaintiff because of same. The court has

viewed the testimony and demeanor of both the plaintiff and Routhier on the witness stand, and finds the plaintiff's version of events in this regard to be much more credible. In fact, the court finds Routhier's testimony to be so lacking in credibility that the law would permit the court to disregard his entire testimony. He contradicted himself repeatedly with prior testimony at examinations before trial, made clearly untrue statements, was vague, and displayed an aggressive and belligerent attitude which leads the court to conclude that almost everything the plaintiff said about Routhier regarding his treatment toward him was true. Routhier despised the plaintiff because of his Egyptian national origin. He exhibited an attitude that the plaintiff, as an Egyptian, had no right to be a part of the defense fabric of the United States of America.

As established by the direct and circumstantial evidence, a reasonable and logical inference to be drawn is that Routhier was very uncomfortable in the presence of the plaintiff, and early during the process, determined that he would have a hands-off attitude so as not to be bothered with the plaintiff and hope that plaintiff might become discouraged and quit. This did not happen because although the plaintiff might have become discouraged, he did not quit. When the plaintiff continued to receive average or above average reports from his evaluators, Ziemba and Sciulli, Routhier decided that it was time for him to step in and take over management of the plaintiff. In September or October 1984, Routhier decided it was time to move to terminate the plaintiff, and events thereafter were a carefully orchestrated campaign designed to build a "paper record" which would convince Crick and Schlunz that plaintiff's deficient performance was the actual reason for the termination. Naturally, Routhier never communicated to his superiors that it was his feelings about the plaintiff's national origin that was the real motive in his campaign for termination. Schlunz principally relied upon reports prepared by Routhier and discussions with Routhier about plaintiff's work and performance. He did not review the evaluations completed by Ziemba and Sciulli. Therefore, Schlunz nev-

er made a completely independent evaluation of whether at this stage in his progress as an auditor-trainee, the plaintiff's performance was so unacceptable that he should be terminated before the end of the one-year probationary period. Based upon the entire record and all of the above, the court concludes that there is direct evidence of discrimination against the plaintiff, and that the motive for his termination was based upon his national origin.

Having met the initial burden of presenting direct evidence that Routhier impermissibly considered national origin in making his decision to terminate plaintiff, this court must proceed under the mixed motive analysis. The burden now shifts to the defendant to prove by a preponderance of the evidence that a legitimate reason, standing alone, would have motivated Routhier to make the same decision at the time the decision was made. *Price Waterhouse*, 490 U.S. at 252, 109 S.Ct. at 1791–92. In making its determination, the court should only consider objective evidence as to its probable decision in the absence of an impermissible motive. *Id.*

The defendant contends that the plaintiff was not qualified to continue as an auditor-trainee beyond the one year probationary period. The court disagrees. Regulations provide that the plaintiff's work should have met "standards of unacceptable performance" in order to terminate him within one year. (Pltf's Exs. 6 & 9) All of his evaluations, *including the ones made by Mr. Routhier subsequent to his decision to terminate the plaintiff,* indicated that he was progressing at a trainee or above trainee level. Even though Routhier made some adverse comments within the body of his later reports, this does not justify terminating the plaintiff as being "unacceptable". Moreover, although defendant relies on Routhier's evaluations of plaintiff's work performance to justify the decision to terminate plaintiff, not only did Routhier complete these evaluations after he had determined to terminate plaintiff's employment, but Routhier's re-evaluations are "infected" with his discriminatory animus. *Simpson v. Diversitech Gen. Inc.*, 945 F.2d 156, 160 (6th Cir.1991), *cert. dismissed,* — U.S. —, 112 S.Ct. 1072, 117 L.Ed.2d 277 (1992) (*cited with approval in Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1040 (2d Cir.1993)). However, even assuming that the plaintiff was not qualified to continue as an auditor-trainee,[9] any lack of qualifications certainly had more to do with the fact that Routhier denied him the proper one-on-one hands-on training to which he was entitled, (and which Routhier was required to give) than any failures on the part of plaintiff. (Pltf's Ex. 9) Routhier gave such training to the other two auditor-trainees. From April to October 1984, when he was under the supervision and direction of Ziemba and Sciulli and received such training, the plaintiff continued to progress satisfactorily. It was only when Routhier took him "under his wing" in November 1984, that plaintiff failed to receive appropriate training and assistance. Efforts were made to increase the number of hours charged against plaintiff's audits by holding his reports for a number of days without returning them. Other insidious efforts were made by Routhier to make the record look bad for the plaintiff, including his lack of availability when plaintiff requested Routhier to assist him with an audit report. Therefore, the court can only conclude that his lack of qualifications was not a "legitimate reason, standing alone" to terminate the plaintiff. *Id.*

Plaintiff was qualified to continue as an auditor-trainee at the time of his termination. The plaintiff's national origin was a motivating factor in Routhier's decision to terminate the plaintiff's employment, and failing to prove that it would have discharged plaintiff in the absence of any discriminatory animus, Title VII was violated.

#### 2. *Indirect Evidence of National Origin Discrimination:*

Assuming that the statements, actions, and attitude of Routhier did not constitute direct evidence of discrimination against the plaintiff, the plaintiff would still be entitled to relief. He has clearly made out a

---

**9.** The court strongly disagrees with any such conclusion.

prima facie case.[10] Under such circumstances, the defendant must come forward with a legitimate reason for the plaintiff's termination, and, in order to succeed, the plaintiff must persuade the court that this proffered reason was merely a pretext *and* that he was the victim of intentional discrimination. *Saint Mary's,* —— U.S. at ——, 113 S.Ct. at 2751. Again, the legitimate reason given for termination of the plaintiff was his performance and not discrimination. Defendant claims that he was just not qualified to continue as a probationary auditor-trainee beyond the first year.

The voluminous files received in evidence have been reviewed. Accepting all of the critique of the plaintiff's performance as an auditor-trainee, it still does not justify his termination by the defendant's own standards. Those standards are found in the Professional Auditor Training Program, and state that "[c]ivilian trainees serving a one year probationary period must be carefully evaluated prior to the end of that period to determine if they should be retained. Refer to the standards of *unacceptable* performance in Attachment 2 when making this important decision." (Pltf's Ex. 9) (emphasis added) The *standards of unacceptable performance* are found in Attachments 2 and 2-2 to those guidelines (Pltf's Exs. 5 & 6), and relate to the rules for completion of the AFAA Forms 43 and 43A, and define unacceptable performance. These are the quarterly and individual audit evaluations. It is very important to note that plaintiff never received even *one* "unacceptable" rating on *any* subdivision of the Forms 43 & 43A evaluations he received from Routhier, Ziemba or Sciulli. (Pltf's Exs. 12, 13, 14, 15, 16, 17, 18, 19, 20 & 21) This includes the numerous re-evaluations made by Routhier in February 1985, when he was making a paper trail to justify the termination of plaintiff to Crick and Schlunz.

The court does not possess the expertise to determine the exact status of the plaintiff as an auditor-trainee at the end of his first year.

However, even without such expertise, the following conclusions are clear from the record. At the time of his termination, plaintiff may not have been the very best auditor-trainee. He was not a "fully qualified" auditor. He appears to have been an average auditor-trainee. However, and most important, he was not an "unacceptable" auditor-trainee. Therefore, under the defendant's own standards, he was qualified to continue in the program, and there was no valid reason to terminate him after the one year probationary period. *See Powell v. Syracuse University,* 580 F.2d 1150, 1155 (2d Cir.1978) ("[T]he plaintiff need not show perfect performance or even average performance ... [h]e need only show that his performance was of sufficient quality to merit continued employment, thereby raising an inference that some other factor was involved in the decision to discharge him."), *cert. denied,* 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978).

The legitimate reason was manufactured by Routhier after he decided to terminate the plaintiff. The plaintiff has demonstrated that such legitimate reason was only a pretext and that he was the victim of intentional discrimination due to his national origin. The plaintiff was the only auditor-trainee with a Middle Eastern national origin (or non-European-American national origin of any kind) among thirty or forty candidates supervised by Routhier from 1972 to 1985, and the only one terminated. This so-called legitimate reason was not the true reason the plaintiff was terminated. By any analysis, he was terminated by Routhier because he objected to plaintiff's national origin as an Egyptian and the fact that he could hold a position within the United States defense community.

### B. *Age Discrimination.*

Section 633a(a) of the Age Discrimination in Employment Act states, in pertinent part: "All personnel actions affecting employees ... who are at least 40 years of age ... in

---

10. Plaintiff is of Egyptian origin; he was qualified to continue as an auditor-trainee pursuant to defendant's own regulations; and he was discharged under circumstances which give rise to an inference of discrimination, i.e., he was the only auditor-trainee of Egyptian origin that Routhier ever supervised and the only auditor-trainee to ever be terminated during the probationary period.

military departments as defined in section 102 of Title 5 ... shall be made free from any discrimination based on age."

The principles set forth above with regard to Title VII are also applicable to an analysis of an ADEA claim. *Taggart v. Time, Inc.,* 924 F.2d 43, 46 (2d Cir.1991); *Russo v. Trifari, Krussman & Fishel, Inc.,* 837 F.2d 40, 43 (2d Cir.1988) (quoting *Pina v. Brattleboro Retreat,* 702 F.2d 322, 323 (2d Cir.1983)). The plaintiff may establish a prima facie case either by direct evidence, or indirect evidence by showing "(1) that he was within the protected age group, (2) that he was qualified for the job; (3) that he was discharged, and (4) that the discharge occurred under circumstances giving rise to an inference of age discrimination." *Stetson v. NYNEX Service Co.,* 995 F.2d 355, 359 (2d Cir.1993); *Russo,* 837 F.2d at 43; *Pina,* 702 F.2d at 324.

### 1. *Direct Evidence of Age Discrimination:*

■ The conversations between the plaintiff and Routhier regarding age do not constitute direct evidence of age discrimination. Rather, they appear to be normal conversations between men of similar age moving on through middle life. The plaintiff has thus failed to show any direct evidence of discrimination based on age. Therefore, in order for the plaintiff to succeed on his ADEA claim, he must establish a prima facie case through indirect evidence under the *McDonnell/Burdine* pretext analysis.

### 2. *Indirect Evidence of Age Discrimination:*

The first three requisites of plaintiff's prima facie case are established since he was a member of the protected age group (he was over forty), he was qualified to continue as an auditor-trainee under defendant's own standards, and he was discharged. The fourth factor is established by the fact that he was the only auditor-trainee of thirty to forty employees over the age of forty between 1972 and 1985, and the only auditor-trainee who was ever terminated during probationary period.

■ Having satisfied his prima facie burden of proof, defendant must now offer a legitimate reason for plaintiff's termination or face the consequent finding that it has discriminated against plaintiff on account of his age. Again, the only legitimate reason either articulated or found anywhere in the record is that plaintiff was unqualified to continue as an auditor-trainee past the one year probationary period. This reason has been rejected by the court. However, *Saint Mary's,* —— U.S. at ——, 113 S.Ct. at 2751, holds that since the ultimate burden of proof is still on the plaintiff once a legitimate reason has been brought forth and rejected by the court, he must prove by a preponderance of the evidence that he was intentionally discriminated against independent of the trier of fact's disbelief of defendant's proffered reasons. *Cosgrove,* 9 F.3d at 1039 ("Thus, once the 'defendant has succeeded in carrying its burden of production, the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant.'") (quoting *Saint Mary's,* —— U.S. at ——, 113 S.Ct. at 2749).

The plaintiff has succeeded in proving that he was terminated because of his age. A reasonable inference from the evidence is that the general attitude Routhier exhibited toward the plaintiff demonstrated that he was irritated and uncomfortable dealing with an auditor-trainee who was older than himself. All of the previous auditor-trainees had been more like students to him, and this was the first time he was confronted with someone not only of the same age, but older. This, together with manufacturing a "paper record" to justify his termination, again shows that Routhier's motivation was the plaintiff's age, not his job performance. There is no other explanation found anywhere in the record to explain why Routhier treated the plaintiff in a manner so different from the way he treated the two other auditor-trainees (ages *29* and *22* ) (Pltf's Ex. 3), and his treatment of other auditor-trainees (mostly in their twenties) throughout the prior thirteen years. Again, it is the only valid explanation as to why plaintiff, the only auditor-trainee over forty, was also the only auditor-trainee to be terminated.

958

## V. SUMMARY.

Routhier was immediately uncomfortable, irritated, distrustful, and unpleasant with the plaintiff because of his national origin and age. This was immediately revealed by his statements, attitude, and refusal to deal with the plaintiff on any meaningful basis in his training and evaluations for the first six months of his probationary period. Thereafter, it was manifested in his campaign to discredit plaintiff in the eyes of Crick and Schlunz. By September or October 1984, Routhier had determined that because of plaintiff's national origin and age, he must be terminated. At this point in time, he took an active interest in plaintiff's work and began to personally supervise (or failed to supervise) the plaintiff, he prepared the first unsatisfactory quarterly report and made reevaluations of the prior audits so as to reflect unfavorably upon the plaintiff. Crick and Schlunz were not participants in the discrimination, since they were in fact, misled by Routhier, and relied upon his oral statements and written evaluations.[11] Both Crick and Schlunz made superficial reviews relying principally upon Routhier in making their decision to support Routhier's termination of the plaintiff. Neither made a truly independent review or evaluation of the plaintiff's performance. Without Routhier, the plaintiff would have continued to be employed by the Department of the Air Force and would have worked up the line as an auditor-trainee. It was specifically because of Routhier's intentional discrimination based on plaintiff's national origin and age that he was terminated. "America's hallmark has been to judge people by what they do, and not by who they are." *Steffan v. Aspin,* 8 F.3d 57, 70 (D.C.Cir.1993). There is no question that if the plaintiff, with his record, had been of European–American national origin between the ages of 25–35, he would not have been terminated at such an early point in his career with the Department of the Air Force. No other auditor-trainee had ever been terminated before the completion of their probationary period in the thirteen years prior to plaintiff's termination. If, within two or three years, the plaintiff had not advanced to a fully qualified auditor, then he may very well have been justly terminated. However, he was denied the opportunity to so qualify. Because plaintiff was denied the opportunity to improve his performance, the defendant "must bear the cost of its lost opportunity" to determine whether, with further training, plaintiff could have become a fully trained auditor. *Cosgrove,* 9 F.3d at 1040.

Despite Routhier's active campaign from September 1984 to March 1985, to effectuate plaintiff's termination, even in the end, there was still no documentary evidence that plaintiff was unacceptable so as to justify his termination as a probationary auditor-trainee! The court finds that the plaintiff was terminated because of his national origin and age, and for no other legitimate reason. It was not "mere chance" that the only auditor-trainee terminated in thirteen years was the only one of Middle Eastern origin *and* the only one over age forty. He is entitled to damages.

## DAMAGES

 As an initial matter, the plaintiff is, of course, required to mitigate his damages. "A victim of age discrimination, like a victim of ethnic, sexual or religious discrimination, is under a duty to use reasonable efforts to mitigate his or her damages by seeking alternate employment and by accepting reasonable offers of employment." *Pierce v. F.R. Tripler & Co.,* 955 F.2d 820, 829–30 (2d Cir.1992); *Clarke v. Frank,* 960 F.2d 1146, 1152 (2d Cir.1992). The burden of proof, in appropriate cases, is on the defendant to prove that the plaintiff has failed to mitigate his or her damages. *See Dominic v. Consolidated Edison Co.,* 822 F.2d 1249, 1258 (2d Cir.1987). Here, however, plaintiff has successfully shown that he has mitigated his damages. He has done so by actively seeking employment immediately after discharge, accepting unemployment benefits, and being employed in his field for the last seven and one/half years.

11. It was stated by the defense that, "Performance was the issue, not discrimination." That may have been true for Crick and Schlunz. It was not true for Routhier, and he was the one who made the real decision to terminate the plaintiff. *See Simpson,* 945 F.2d at 160.

After his termination, the plaintiff was out of work for approximately one year and during that time he received $4,472.00 in unemployment compensation. In March 1986, he started as a tax auditor with the Alabama State Department of Taxation where he is employed at the present time. His starting salary was approximately $20,000, per annum, and it has progressed until today he is earning $33,000, per annum. His actual or approximate earnings were as follows:

| 3/86 to | 3/87 | $ 13,841.00 | |
|---|---|---|---|
| 3/87 to | 3/88 | 25,292.00 | |
| 3/88 to | 3/89 | 28,446.00 | |
| 3/89 to | 3/90 | 29,070.00 | |
| 3/90 to | 3/91 | 29,911.00 | |
| 3/91 to | 3/92 | 30,500.00 | (app.) |
| 3/92 to | 3/93 | 31,500.00 | (app.) |
| 3/93 to | 12/93 | 24,750.00 | (app.) |
| | Total | $213,310.00 | |

The total unemployment compensation and earnings received by the plaintiff is $217,782.00.

If the plaintiff had completed his training program and continued with the Air Force Audit Agency as an auditor, his salary would have progressed as follows:

| 4/14/85 to | 4/28/85 | $ 736.72 |
|---|---|---|
| 4/28/85 to | 4/27/86 | 21,804.00 |
| 4/27/86 to | 5/11/86 | 866.58 |
| 5/11/86 to | 1/1/87 | 16,741.79 |
| 1/1/87 to | 5/10/87 | 9,405.69 |
| 5/10/87 to | 5/24/87 | 1,079.92 |
| 5/24/87 to | 1/1/88 | 20,041.23 |
| 1/1/88 to | 5/22/88 | 12,776.15 |
| 5/22/88 to | 1/1/89 | 21,123.08 |
| 1/1/89 to | 5/21/89 | 13,743.46 |
| 5/21/89 to | 1/1/90 | 22,699.08 |
| 1/1/90 to | 5/20/90 | 14,697.31 |
| 5/20/90 to | 1/1/91 | 24,250.46 |
| 1/1/91 to | 1/1/92 | 41,023.00 |
| 1/1/92 to | 5/17/92 | 15,618.73 |
| 5/17/92 to | 1/1/93 | 27,102.15 |
| 1/1/93 to | 1/1/94 | 45,670.00 |
| | Total | $309,379.35 |

(Def's. Ex. F)

The back pay would be the difference between the amount of money he actually received from unemployment and salary, and the money he would have received had he not been unjustly terminated. Therefore, over the years, plaintiff lost the sum of $91,597.35, in back pay. In addition, the court will also award prejudgment interest to this date compounded yearly in the sum of $54,258.87. *See Reichman v. Bonsignore, Brignati & Mazzotta P.C.,* 818 F.2d 278, 281 (2d Cir. 1987); *see also Saulpaugh v. Monroe Community Hosp.,* 4 F.3d 134, 145 (2d Cir. 1993).[12] The total monetary damages to the plaintiff is in the sum of $145,856.22.

In addition, the plaintiff is entitled to be reinstated by the defendant to the position of auditor, GS–12, Step 5.

Therefore, it is

ORDERED that

1. Plaintiff is awarded the sum of $145,856.22, against the defendant;

2. Plaintiff be reinstated by the defendant to the position of auditor, Grade GS–12, Step 5, as of January 1, 1994; and

3. Plaintiff may file an application for attorney's fees and expenses within fourteen (14) days. The defendant may file its opposition to plaintiff's application, if any, within fourteen (14) days thereafter.

The clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.

---

12. Prejudgment interest has been determined by annual rates of 11% in 1985, 9.5% in 1986, 9.25% in 1987, 10.5% in 1988, 11.5% in 1989, 11% in 1990, 11% in 1991, 8% in 1992, and 7% in 1993. These rates are based on the federal short-term rate pursuant to the Internal Revenue Code, 26 U.S.C. § 6621, guidelines for underpayment of taxes.