41 F.3d 1508
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Joyce TAYLOR, Plaintiff-Appellant,
v.
NCR CORPORATION, Defendant-Appellee
 No. 93-3538.
 United States Court of Appeals, Sixth Circuit.
 Nov. 28, 1994.
 
 Before: MERRITT, Chief Judge; MILBURN and SILER, Circuit Judges.
 MERRITT, Chief Judge.
 
 
 1
 Plaintiff Joyce Taylor was a Senior Systems Engineer in defendant NCR Corporation's healthcare software division. In January 1990 NCR management announced that the division would be eliminated and its employees would have to find other positions. Alone of the twenty-one employees in that division, plaintiff did not find another position at NCR and was discharged in February 1991. She alleges that this was the result of sex and age discrimination, primarily on the part of her male supervisor, whom she reports having made a number of disparaging remarks about women in the workplace. The district court granted summary judgment for NCR, finding inter alia that the supervisor with the alleged discriminatory animus was responsible neither for NCR's decision to downsize nor for plaintiff's failure to find another position.
 
 
 2
 We partially reverse the decision below because we believe in light of the alleged sexist comments of plaintiff's supervisor that there is a real conflict in the evidence, and hence genuine issues of material fact, as to whether he (1) gave less help to plaintiff than to others in their search for new positions, and (2) made material misstatements to NCR management as to whether plaintiff refused to consider an entry-level opening for which she had interviewed and whether she said she would rather be laid off, thereby causing management to decide she was eligible for termination. This is a close case on the facts and should not have been disposed of on summary judgment.
 
 
 3
 * * *
 
 
 4
 Joyce Taylor was born on February 2, 1938. She began her employment with NCR in April 1966, left in 1974, and returned in 1977. She received regular pay raises and in October 1982 was promoted to Senior Systems Engineer in NCR's Healthcare Division. In April 1987 she began reporting to Carol Good, a male, who remained her immediate manager until her termination from NCR in February 1991. While Taylor reported to Good, she consistently earned pay raises and performance reviews with above average to excellent ratings. There is no dispute that at all relevant times she performed her job in a satisfactory manner.
 
 
 5
 During the 1980s NCR's Healthcare Division was primarily involved in selling customized, proprietary software to health care providers. Two of NCR's software products were "CARE" and "MEDNET," and Taylor's primary duties included the installation of CARE in health care facilities. In late 1989 NCR executives decided to eliminate the marketing and installation of CARE and MEDNET because NCR's proprietary software was no longer competitive. In November or December 1989 NCR upper management told Carol Good of this decision. In January 1990 Good communicated the decision to his twenty-one subordinates at a departmental meeting, informing them that after they finished their current projects they would need to find other positions. He did not give a certain date by which they needed to do so but did indicate that once the current projects were complete no new work would be taken on.
 
 
 6
 Taylor's health care assignments ended in early spring of 1990, after which she was temporarily assigned to another NCR division until August 1990. She had three job interviews within NCR in September and October, none of which led to a new assignment. In December 1990 Good suggested that Taylor interview for an entry-level position in the Software Support Department managed by Bill Thomson. This position had been open since July 1990, and two other NCR employees (Bruce Bays and Susan Vasilakis) had previously interviewed for it and turned it down. It is undisputed that Taylor was qualified for this position. At the conclusion of their interview on December 10, 1990, Thomson asked Taylor whether she was interested in the position. Taylor told Thomson that she would like to consider the vacancy and would get back to him. It is undisputed that Thomson did not offer the job to Taylor on this occasion or later, and that Taylor never indicated to Thomson or any other manager that she wanted the job. Apparently Taylor was not enthusiastic about taking an entry-level position nor working for Bob Bell, Thomson's supervisor.
 
 
 7
 Taylor had no further interviews within NCR, and of the twenty-one employees of the healthcare software group, including at least two other women, she alone failed to find new employment within NCR. The official reasons given for her discharge were that her position and department had been eliminated and that she had failed to find a new position. She claims that both the failure to relocate within the company and the ultimate discharge were the result of sex and age discrimination.
 
 
 8
 In April 1991, Taylor filed a charge of discrimination with the Equal Employment Opportunity Commission and the Ohio Civil Rights Commission. In October 1991 EEOC issued a Notice of Right to Sue and dismissed the charge. There is no dispute that Taylor has satisfied all prerequisites to bring her own suit. In January 1992 Taylor filed suit against NCR in the Southern District of Ohio, alleging violations of: (1) Title VII, 42 U.S.C. Sec. 2000e-2; (2) the Age Discrimination in Employment Act (ADEA), 29 U.S.C. Sec. 623; (3) the analogous state sex and age discrimination laws, Ohio Rev.Code Ann. Secs. 4112.02, 4112.99 (Anderson 1993); and (4) Ohio public policy. Jurisdiction over the state claims was based upon pendent jurisdiction and/or diversity. Taylor is a resident of Kentucky and NCR is an Ohio corporation with its principal place of business in Ohio.[1] In March 1992, the case was referred by consent to Magistrate Judge Michael Merz, who granted NCR's motion to strike Taylor's demand for compensatory and punitive damages under Title VII as well as her public policy claim under Ohio law. In May 1993, the Magistrate granted NCR's motion for summary judgment on all remaining counts.
 
 
 9
 * * *
 
 
 10
 Summary judgment must be granted unless on the evidence presented a jury could reasonably find for the nonmoving party. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986); Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986). In Anderson, the Supreme Court stated that
 
 
 11
 the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of evidence that the plaintiff is entitled to a verdict.
 
 
 12
 477 U.S. at 252. As this circuit has noted, this means that the "mere possibility" of a factual dispute is not enough. Gregg v. Allen-Bradley Co., 801 F.2d 859, 863 (6th Cir.1986). Because this appeal is taken from a grant of summary judgment below, we review the magistrate's findings de novo. EEOC v. University of Detroit, 904 F.2d 331, 334 (6th Cir.1990).
 
 
 13
 Where there is direct evidence of discriminatory animus, the burden of proof shifts to the defendant to show, as an affirmative defense and by a preponderance of the evidence, that it would have made the same decision in the absence of the unlawful motive. Price Waterhouse v. Hopkins, 490 U.S. 228, 242, 246, 258 (1989); Terbovitz v. Fiscal Court of Adair County, 825 F.2d 111, 114-15 (6th Cir.1987). As the Supreme Court has written,
 
 
 14
 In saying that gender played a motivating part in an employment decision, we mean that, if we asked the employer at the moment of the decision what its reasons were and if we received a truthful response, one of those reasons would be that the applicant or employee was a woman.
 
 
 15
 Price Waterhouse, 490 U.S. at 250.
 
 
 16
 Taylor cites nine incidents demonstrating discriminatory animus. On five occasions between 1987 and 1990, she alleges, Carol Good told her at the NCR office or during business hours that "a woman's place is in the home." On another occasion, in 1988 or 1989, when Taylor was relating to Good her difficulties "fulfilling her responsibilities at home while traveling for the company," Good allegedly told her she ought to get married and stay home. Finally, on two occasions, Good allegedly remarked "that because ... a certain employee was having a difficult day it must have been 'her time of the month.' " Taylor also alleges that during an interview in the fall of 1990, prior to the interview with Bill Thomson, the (unnamed) interviewer told her he was getting a divorce. Referring to his wife, he said "that bitch is taking me for everything I've got," and "all you women are all alike." Taylor does not name the interviewer nor allege that he denied her a job, and the magistrate did not discuss this incident. We will focus in the remainder of this opinion on the eight incidents allegedly involving Carol Good.
 
 
 17
 NCR argues that, assuming the nine incidents took place, they did not happen at the time the decision to discharge Taylor was being made and so are not direct evidence of animus in that decision. Since Taylor alleges that the incidents continued into 1990, however, we find that they are sufficiently contemporaneous to make an issue of fact.
 
 
 18
 The magistrate found that, even assuming these alleged incidents showed Good's discriminatory animus, they were not direct evidence of employment discrimination because Good made neither the decision to eliminate the CARE product line nor the decision to discharge Taylor. While it is undisputed that the decision to eliminate Taylor's position, along with her entire department, was taken by upper management and not by Good, Taylor asserts that Good was in effect the "but for" cause of her discharge. The magistrate did not directly take up this argument. Taylor asserts that even if Good was not involved in the decision to downsize he did have discretion over the amount of assistance he gave her in finding a new job within NCR and over when and how (or even whether) to begin the formal termination procedures. Furthermore, she says, Good materially misrepresented to his superiors her actions with regard to the position in Bill Thomson's department and was therefore not the mere messenger or bureaucratic mechanism of her termination but the material cause of upper management's misinformed decision that she had elected not to avail herself of opportunities within NCR and should therefore be terminated now that her department was gone.
 
 
 19
 We find that the evidence discussed below, which for purposes of the motion for summary judgment we construe in the light most favorable to the plaintiff, Univ. of Detroit, 904 F.2d at 334, sustains Taylor's theory of Good's role in her termination enough to create a material issue of fact as to sex discrimination.
 
 
 20
 A. Proof that tends to show that manager Carol Good gave his employee Joyce Taylor less help than he gave others in finding new positions within NCR.[2]
 
 
 21
 1. Good told his twenty-one employees in January 1990 that their department would be dissolved and they would have to find other positions once they completed their current projects. In his deposition Good said he indicated to his employees that "we would have to find other opportunities for them within the company." He testified that he suggested that Taylor take training courses on the UNIX operating system to make her more attractive for other placements and that he arranged for NCR to pay for these courses through his departmental budget. However, he admitted at deposition that he never directly told Taylor or the others that they would be terminated if they did not find other positions. Moreover, from March to August 1990 Taylor was temporarily assigned to Internal Support Systems. According to Taylor, Good told her that as long as she was at ISS she should not look for another job within NCR. This significantly cut down the amount of time she had to find another position.
 
 
 22
 2. Thomson testified that one week after their interview Taylor told him she was not interested in the position and that he related this information to the placement office. Susan Hoying of that office testified that Taylor had also told her of her disinterest in working in that part of NCR. However, Taylor asserts that during this second meeting with Thomson she asked him follow-up questions about how moving to an entry-level position would affect her benefits. She also asserts that soon after the original interview she expressed to Good her interest in the position but also her concern about salary and benefits because the Thomson vacancy was a lower position than the one she was losing. She was puzzled that no one had discussed salary with her and told Good that she would almost rather be laid off than take an entry level position and cut in pay. Good knew of her concerns but did nothing to help her find out what the salary and benefits would actually be in the Thomson position. In fact, Thomson testified that he could have absorbed her current salary into his budget. Had Taylor known this, she might have been more encouraged about pursuing the Thomson position.
 
 
 23
 3. Paul Russell held the same position as Taylor in the CARE group, also with Carol Good as his manager. His position was eliminated as well, and as of the end of 1990, when the group dissolved, he had not found another position. In January 1991 he began to work directly for Beryl Chandler, Good's supervisor. Chandler testified that Russell had skills he was able to loan out to other parts of NCR off his own budget, that Russell possessed "development skills which were in demand by various NCR departments," and that "Joyce Taylor did not have such development skills." But by Russell's own testimony, his job duties entailed reporting to work each day and looking for another position at NCR. He found one in 1992. Thus he had at least a year longer than Taylor to find a replacement position.
 
 
 24
 4. Bruce Bays also held the same position as Taylor and had also interviewed for the Bill Thomson vacancy. Bays formally declined that position, yet he was allowed to remain with NCR until he found another position at the end of July 1991, some five months after Taylor was discharged.
 
 
 25
 B. Proof that tends to show Good acted deceptively in initiating Taylor's termination.
 
 
 26
 1. On the day that Good and Taylor spoke about her interview with Thomson, Good called Susan Hoying in the Placement Department and told Hoying that Taylor was not interested in the Thomson position, which was arguably a misrepresentation of Taylor's views. Hoying concluded from this that Taylor was a "candidate for reduction in force because she refuses to interview in an organization that has opportunities." Good thus caused the Placement Department to have a false picture of Taylor and may have caused the Placement Department to scale back its efforts on Taylor's behalf.
 
 
 27
 2. As detailed below, Good caused this false picture of Taylor's views and behavior to become accepted throughout NCR as the truth even though he admitted knowing of no NCR policy that if an employee refused to interview with another NCR group the employee was "a candidate for RIF" (reduction in force).
 
 
 28
 3. The day after Taylor's interview with Thomson, Good met with Terry Kramer, manager of employee relations, and they concluded that Taylor's refusal to consider the Thomson position qualified her for a "reduction in force." Kramer, being careful, asked Good to check with Taylor to make sure that she understood that turning down the Thomson position would result in her termination. Kramer testified that Good later told him he had done so and that Taylor had said she would rather be terminated. However, Good admitted that he never told Taylor that if she did not find another position within the company she would be discharged. Thus, Good caused Kramer to have a false picture of Taylor.
 
 
 29
 4. Good spoke to Beryl Chandler, his immediate supervisor, seeking permission to terminate Taylor. According to Chandler, Good said that he had exhausted his attempts to place Taylor in another NCR position and that she had refused the Thomson placement. On the basis of these representations, Chandler agreed to terminate her. Good thus caused Chandler to have a false picture of Taylor.
 
 
 30
 5. NCR upper management wrote Kramer to ask whether everything had been done to place Taylor within NCR. Kramer asked Hoying to check, and based on her information from Good she responded that "Bill Thomson ... verbally offered Joyce a Software Support Analyst position in Dayton ... [and that] Joyce declined[.]" Both parties agree that this was a misstatement of fact. Good thus misled Kramer both directly and through Hoying.
 
 
 31
 Kramer then sent a memorandum to W.W. Holloway, Assistant Vice President in charge of personnel, saying that "As stated in Susan Hoying's attached letter, Joyce has rejected a Dayton offer [from Thomson.] ... We will continue to attempt to find a position, but request approval for reduction of Ms. Taylor."
 
 
 32
 Two days later, Kramer reassured upper management that Good's erroneous story about Taylor was true, writing again to Holloway that
 
 
 33
 Carol Good said ... he explained this possibility to Joyce [that her rejection of Thomson's offer could result in her termination] when she returned from [the] interview and informed him that she was rejecting the offer. Joyce then replied she absolutely would not work in that organization (Bill Thomson ... had verbally made the offer) and would rather be RIFd than do so.
 
 
 34
 Carol Good said he discussed the offer further to assure Joyce was making a thought-out decision, and Joyce confirmed that she understood and would not take the position in Thomson's organization. Joyce added that she would work elsewhere if a job was available, but not there.
 
 
 35
 In fact, it is undisputed that Thomson never made an offer and that Good never told Taylor that failure to take the position would mean termination. By providing Hoying, Kramer, and Chandler with misinformation about Taylor which they passed on to upper management, Good caused upper management to have a false picture of Taylor. On this basis, upper management approved her termination.
 
 
 36
 6. Management's misinformation by Good is confirmed by its letters to the EEOC responding to Taylor's initial charges of discrimination. NCR wrote EEOC that "Taylor was offered a position ... but declined acceptance of the offer even though she knew reduction in force would be the alternative." NCR also wrote that Taylor had been offered that position at the same salary and that Good had warned her that rejection of the position would lead to her termination. Even NCR suggests that these erroneous statements might "give rise to an inference of discriminatory animus."
 
 
 37
 7. Add to all of this Good's alleged comments belittling women in the workplace, and there is some evidence that Taylor lost her job as a result of Good's sex-based animus.
 
 
 38
 C. The magistrate found that, even taking all of Taylor's allegations as true, there was no genuine issue of material fact as to the Thomson vacancy because Taylor had never told Thomson that she was interested in the job. However, following plaintiff's theory of the case as outlined above, it is not decisive that Thomson never made the offer and Taylor never actively pursued the job because the case will revolve not around the narrow issue of the Thomson position but around the broader issue of Good's portrayal of Taylor and NCR management's reliance upon Good's representations. Similarly, the magistrate's findings that Good did not make the decision to cease marketing the software lines Taylor worked on and that he did not make the decision to discharge her and her coworkers are not dispositive because the case will focus not on these decisions per se but on Good's role in causing them.
 
 
 39
 Taylor need not show that upper management acted with discriminatory animus in discharging her so long as she can show that Good was motivated by discriminatory animus toward her and that Good's sex-based actions led upper management to discharge her. See Simpson v. Diversitech General, Inc., 945 F.2d 156, 160 (6th Cir.1991), cert. denied, 112 S.Ct. 1072 (1992) (reversing judgment for employer because of evidence that supervisory employee's racially motivated disciplining of employee resulted in employee's discharge by higher management).[3]
 
 
 40
 We do not take any position on whether Taylor should ultimately prevail on the merits, but the combination of her allegations and NCR's own admissions constitutes more than a "scintilla of evidence in support of [her] position," Anderson, 477 U.S. at 252, and is sufficient to give her the right to a trial on the merits.
 
 
 41
 * * *
 
 
 42
 We agree with the magistrate judge, however, that there is no evidence of age discrimination. Taylor's only direct allegation in this regard concerns references to her age in the paperwork involved in her discharge. As the magistrate wrote, however, employers are required by the ADEA to keep track of their employees' ages and these references therefore cannot constitute evidence of age-based animus.
 
 
 43
 We therefore VACATE the district court's grant of summary judgment as to plaintiff's claims under Title VII and the analogous Ohio sex discrimination provision and REMAND for trial on those claims and AFFIRM the district court's judgment as to all other claims.
 
 
 44
 SILER, Circuit Judge, concurring in part and dissenting in part.
 
 
 45
 I concur with the majority's conclusion that there is no evidence of age discrimination in this case. However, I respectfully dissent from the majority's conclusion that there was sufficient evidence to present a jury question on the issue of sex discrimination. Considering the evidence in the light most favorable to the plaintiff, she has not established a prima facia case of disparate treatment under McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Instead, as the majority opinion states, she proceeds under the direct proof of sex discrimination from Terbovitz v. Fiscal Court of Adair County, 825 F.2d 111, 114-15 (6th Cir.1987). Unlike the factual situation in Terbovitz, however, in this case, the statements of discriminatory animus were made by Carol Good, a person who did not make the decision to discharge. In addition, most of those remarks, improper as they were, were made prior to the time the issue of discharge arose.
 
 
 46
 It is significant in this case that all employees in her Health Care Group were told that their jobs were being eliminated and that they would have to find employment elsewhere in NCR or outside the company. When Joyce Taylor had an opportunity for another job, the entry-level position under Bill Thomson, she indicated no interest in the job after her interview. Finally, her case might be stronger if she was the only woman in that group that was discharged. However, there were other women in the Health Care Group whose jobs were being eliminated, although all of the rest of the women found other positions.
 
 
 47
 Therefore, I agree with the Magistrate Judge's conclusion that there was insufficient evidence upon which a reasonable jury could conclude that NCR laid her off because of her sex, so I would affirm.
 
 
 
 [1]
 As the parties and the court below agreed, the state claims are governed by the federal standards of proof. As a result, for the purpose of summary judgment the state claims live or die with their federal cousins, and this discussion will focus on the latter
 
 
 [2]
 Because this case comes to us on appeal from a grant of summary judgment below, we must assume for the purposes of this opinion that Good comported himself in the manner that Taylor asserts
 
 
 [3]
 See also Shager v. Upjohn Co., 913 F.2d 398, 405 (7th Cir.1990); Perez v. Curcio, 841 F.2d 255, 258 (9th Cir.1988). Other courts have implied the same principle but have granted summary judgment because the plaintiff failed to demonstrate any such nexus between the individual with the animus and the adverse employment decision. See Wilson v. Stroh Cos., 952 F.2d 942, 946 (6th Cir.1992); Williams V. Williams Electronics, Inc., 856 F.2d 920, 925 (7th Cir.1988); La Montagne v. American Convenience Products, Inc., 750 F.2d 1405, 1412 (7th Cir.1984); Mauter v. Hardy Corp., 825 F.2d 1554, 1558 (11th Cir.1987)